## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-374 (DLF)** |
| **v.** | : | |
| | : | |
| **LILITH ANTON SAER,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Lilith Anton Saer to 60 days of home detention, 36 months of probation, 60 hours of community service, and $500 in restitution.

### I.     Introduction

Defendant Lilith Anton Saer, age 31, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Defendant Saer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 60 days of home detention, 36 months of probation, 60 hours of community service, and $500 in restitution is appropriate in this case because (1) Saer  entered the

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Capitol through the Senate Wing Door at a time that the entrance was completely overrun by rioters and alarms were blaring; (2) despite this, she remained inside the building for approximately six minutes, and even after exiting from the Capitol, she remained on the east plaza, listening to the violent rhetoric of Jacob Chansley, the "QAnon Shaman"; (3) Saer has yet to show any remorse for her participation in the riot; and (4) her social media since January 6 has downplayed the rioters' conduct and suggested that the police committed acts of brutality inside the Capitol.

The Court must also consider that Saer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Saer's crime support a sentence of 60 days of home detention, 36 months of probation, 60 hours of community service, and $500 in restitution. A sentence of home detention and probation is appropriate, and not one of probation only, because Saer trespassed into the Capitol after confronting clear signs of a forced breach, such as tear gas, alarms, broken glass, and property damage; she has not shown remorse for her conduct; and she has used social media to minimize the conduct of the rioters (and thus, her own conduct) with inaccurate suggestions that the rioters were victims of police brutality, and to imply that the FBI was hiding evidence about the election.

## II.      Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at 1-3.

*Defendant Saer's Role in the January 6, 2021, Attack on the Capitol*

Saer flew from Portland, Oregon, to Washington, D.C. a few days before January 6, 2021. On January 6, 2021, after attending the "Rally to Save America," Saer marched east on Constitution Avenue toward the Capitol. She gathered with hundreds of rioters at the Peace Monument, located at the intersection of Pennsylvania Avenue and 1st Street NW, and then pierced the restricted perimeter established by the United States Capitol Police ("USCP").



Image 1: Saer (bottom right, circled in yellow) at the Peace Monument.

From the Peace Monument, Saer proceeded to the northwest courtyard of the Capitol building, arriving there at approximately 2:43 p.m.  and joining rioters amassed outside the Senate Wing Door. At that point, the USCP had secured the Senate Wing Door after its earlier breach at approximately 2:13 p.m. with improvised barricades against the doors and adjacent windows.



Image 2: Saer (bottom right, circled in yellow) in the northwest courtyard of the Capitol building.



Image 3: Saer (middle, circled in yellow), standing in group of rioters near the Senate Wing Door.

While she was outside the Senate Wing Door, alarms from within the building were blaring and audible from the exterior, as captured in Exhibit 1, a video taken by another rioter. In Exhibit 1, the alarms are audible from the start of the video, at time stamp 00:00, and Saer is visible at time stamp 00:03 when someone says, "What's that ringing sound?" Rioters were continually chanting, "Let us in!" and "USA! USA!" Tear gas was deployed, which is visible in Exhibit 2, a video taken by another rioter, at time stamp 11:13. In Exhibit 3, a video taken by another rioter, the camera

captures Saer at time stamp 5:41. Nine seconds later, at time stamp 5:50, someone comments, "That's tear gas."

At 2:47:22 p.m., as captured in Exhibit 4, which is Capitol CCTV, the crowd violently breached the Senate Wing Door again. The man in the orange sweatshirt and blue bandanna, seen in the foreground of Image 3, led this breach of the Senate Wing Door, as captured in Exhibit 4 at 2:47:41. Image 3 is a screenshot from Exhibit 4. Based on this, Saer would have had a direct line of sight to this forced entry. Rioters struggled with police in the entry until 2:48:42 p.m., when the police line collapsed.



Image 4: Screenshot from Exhibit 4 showing the rioter in orange, also captured in the foreground of Image 3, hitting USCP officers with a flagpole at time stamp 2:47:41.

At 2:56:08 p.m., within 10 minutes of the violent breach, Saer entered through the doors with broken panes of glass, as seen in Image 4, with hundreds of other rioters, none of whom went through a security check. When Saer entered, the crowd already inside was shouting "Traitors! Traitors!" at a group of USCP officers, as captured in Exhibit 5, a video taken by another rioter, at

time stamp 29:21. Saer appears to be smiling as she entered, as captured in Exhibit 4 at 2:56:10 p.m.



Image 5: Saer entering the Capitol through the Senate Wing Door, which had broken panes of glass (top left).



Image 6: Screenshot from Exhibit 4 showing Saer (middle, circled in yellow) entering the Capitol building through the Senate Wing Door, at time stamp 2:56:12.

Once inside the building, Saer walked south and walked through the Crypt, the southwest hallways, and the Hall of Columns. She exited the building through the South Door at approximately 3:02 p.m. Saer was inside the building for approximately six minutes.



Image 7: Saer in the Hall of Columns in the Capitol building.

After exiting the Capitol building, Saer remained on the east plaza of the Capitol building grounds as part of a group of rioters who were listening to Jacob Chansley, the "QAnon Shaman," speak, during which he stated "We have a 100 million patriots. We're not afraid to use our firearms!" and "This is our 1776!"



Image 8: Screenshot from Exhibit 6 at 00:04, showing Saer (right) on the east plaza of the Capitol listening to Chansley (left) speak.

*Social Media Posts*

After the attack on the Capitol, Saer used her public Twitter account to spread false information to approximately 158 followers that the insurrection did not happen, to amplify claims that police committed acts of brutality inside the Capitol, and to imply that the FBI was hiding evidence about the election. A selection of Saer's statements on Twitter relating to the riot is summarized below.

On November 23, 2021, Saer re-tweeted another account that had tweeted: "Surveillance video: "The supervisor (we call him "white shirt") takes his baton and starts spearing the woman in the eye with it. Jamming her with full force in the face. She turns her head and he jams the back of her head and ear. He is then punching…"

On November 23, 2021, Saer re-tweeted another account that had tweeted: "I personally witnessed police brutality in the Capitol. One officer was directing people to exit the Capitol at the

eastern door by the Rotunda. Another police officer, in a bicycle helmet, was hitting people with his baton as they were trying to leave, including in the head."

On November 29, 2021, Saer re-tweeted another account that had tweeted: "QAnon Shaman gets 41 months in prison for walking around the Capitol. Leftist Antifa member gets probation & a fine for taking an axe to a senator's door, and the FBI even returned the axe. Sounds about right."

On December 12, 2021, Saer re-tweeted another account that had tweeted: "Are we still pretending Trump was an agent of Putin? The Charlottesville lie? Kavanaugh is a gang rapist? There was an insurrection Jan 6? Rittenhouse is a white supremacist? Jussie Smollett is a victim of a hate crime perpetuated by Trump supporters? Waukesha was a car accident?"

On December 15, 2021, Saer re-tweeted another account that had tweeted: "If the FBI is hiding 14,000 hours of video footage from one building on January 6th, how much evidence are they hiding from November 3rd?"

On March 6, 2023, Saer re-tweeted another account that had tweeted: "BREAKING: Never before seen video of January 6 shows Jacob Chansley, the QAnon Shaman, being led through the Capitol by police the entire time he was in the building."

On March 9, 2023, Saer re-tweeted another account that had tweeted: "JUST IN: Censored video re-emerges of ANTIFA IN BLACK CLAD being identified and forced from the steps of the Capitol by Trump Supporters.. WON'T SEE THIS ON CNN.." (sic).

*The Charges and Plea Agreement*

On June 27, 2022, the United States charged Saer by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On July 7, 2022, law enforcement officers arrested Saer in Oregon. On November 17, 2022, the United States charged

Saer by a 4-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On January 18, 2023, pursuant to a plea agreement, Saer pleaded guilty to Count 4 of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Saer agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Saer now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. She must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 60 days of home detention, 36 months of probation, 60 hours of community service, and $500 in restitution.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp.3d 1, 8 (D.D.C.  2021). While assessing Saer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Notably, for a misdemeanor defendant like Saer, the absence of violent or destructive acts is not a mitigating factor. Had Saer engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Saer's case is that she entered the building at a time when it was completely overrun with rioters. She entered with a mob that proceeded from the Peace Monument through the recently breached Senate Wing Doors. No one in this mob of rioters passed through any security measures before entering. United States Capitol Police and Metropolitan Police Officers ultimately struggled for hours to quell the riot and eject the rioters. Congress could not reconvene to certify the electoral vote until every rioter had been removed from the Capitol and the building was secured. As Judge Kollar-Kotelly succinctly stated, "Indeed, even the presence of *one* unauthorized person in the Capitol is reason to suspend Congressional proceedings." *United States v. Rivera*, 607 F.Supp.3d 1, 9 (D.D.C. 2022) *See also United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Saer's participation in a riot that actually succeeded in halting the Congressional certification renders a sentence of home detention, with probation and community service, as both necessary and appropriate.

 Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of home detention in this matter.

### B.  The History and Characteristics of Saer

Saer, age 31, is a self-taught software engineer. She graduated from high school in 2010 and attended one year of college. In 2022, she obtained an Ethical Hacker Certification. PSR ¶¶ 43, 44.

From 2015 through 2023, Saer worked at various companies as a software engineer. Most recently, she worked remotely with a company headquartered in London at an annual salary of $196,300.00, until her termination in February 2023. She was employed on January 6, 2021, and at the time of her arrest. She is currently unemployed. PSR ¶¶ 45-50. Saer owns her own home and can reside there if sentenced to a term of home detention. PSR ¶ 34.

As set forth in the PSR, Saer has no criminal history.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238 (TFH), Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188 (RDM), Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

After January 6, 2021, Saer used her social media platform to spread false information that the events of that day were not an insurrection, and to minimize the conduct of the rioters. She also used social media to perpetuate the false idea that the police guided rioters around the building as if the rioters were tourists, and that the police committed acts of brutality inside the Capitol.

Although Saer quickly agreed to plead guilty following her arraignment on the Information, she has not expressed remorse for her actions on January 6.  Her lack of remorse and her efforts to deny and minimize the gravity of the riot at the Capitol reflect the need for a sentencing that will deter Saer individually from similar wrongdoing.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Saer based on her own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Saer has pleaded guilty to Count 4 of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases,

even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory

range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent a short amount of time within the Capitol.

In *Unites States v. Jack Griffith*, 21-CR-00204 (BAH), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Griffith entered through the Senate Wing Door and walked to the Crypt, where he posed for a photo with his fist raised, and then exited at Senate Wing Door, having been inside the Capitol for approximately ten minutes. Griffith demonstrated a lack of remorse after January 6, trivializing the criminal proceedings. Even six months after his arrest and mere weeks before he pled guilty, he produced Tik Tok videos in which he blamed the "main-stream media' for his actions on January 6 and promoted conspiracy theories. Judge Howell sentenced Griffith to 3 months of home detention, 36 months of probation, and $500 in restitution. The *Griffith* case closely aligns with Saer's conduct; as such, a similar sentence is appropriate.

In *United States v. Nicholas Hendrix*, 21-CR-426 (CKK), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Hendrix was a veteran suffering from PTSD who entered the Capitol through the East Doors and stayed inside for 90 seconds. He returned to the East Doors intending to re-enter the Capitol,  remained outside recording, and then left after officers sprayed him. The government recommended a split sentence including 14 days in jail; Judge Kollar-Kotelly exceeded the government's recommendation and imposed a sentence of 30 days of jail and 36 months of probation.

In *United States v. Jason Hyland*, 21-CR-50 (CRC), the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Hyland went back to at his hotel after attending the rally at the Washington Monument, and saw news that explicitly reported violent activity at the Capitol with police being overwhelmed. Despite this, he went to the Capitol, approaching and entering through the East Doors. He was inside for 90 seconds. After exiting, he yelled at police, calling them traitors. He was highly remorseful, gave a recorded statement to the FBI before arrest, and consented to a search of his phone. Judge Cooper sentenced Hyland to 7 days of jail, $500 in restitution, and a $4,000 fine.

The government is aware of this Court's sentence in *United States v. Jackson Kostolsky*, 21-CR-00197 (DLF), where the defendant pleaded guilty to 40 U.S.C. § 5104(e)(2)(G). Kostolsky scaled a wall, entered the building approximately 30 seconds after the initial breach, said he had fun and that politicians were crawling in fear, lied to FBI, and deleted video of the event. This Court sentenced Kostolsky to 30 days of home detention, 36 months of probation, and $500 in restitution. Kostolsky was inside the Capitol for approximately ten to thirteen *seconds*, and he exited when Capitol Police yelled, "Get out!" Like Saer, Kostolsky did not show remorse for his actions after the fact. In Saer's case, she promoted theories over social media attempting to

20

diminish the gravity of the attack on the Capitol on January 6 in a way that is not consistent with facts. Her protracted efforts to justify the attack reflect a greater need for deterrence in contrast to defendants who can appreciate and do not deny the wrongful nature of their conduct.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.[3]

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation,"

## V.        Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Saer to 60 days of home detention, 36 months of probation, 60 hours' community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing his acceptance of responsibility for her crime.

---

described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Carolina Nevin*
        CAROLINA NEVIN
        Assistant United States Attorney
        NY Bar No. 5226121
        601 D Street, NW
        Washington, DC 20530
        (202) 803-1612
        carolina.nevin@usdoj.gov

## CERTIFICATE OF SERVICE

On this 28th day of March, 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

By:     /s/ *Carolina Nevin*
        CAROLINA NEVIN
        Assistant United States Attorney
        NY Bar No. 5226121
        601 D Street, NW
        Washington, DC 20530
        (202) 803-1612
        carolina.nevin@usdoj.gov